IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| v. | : | CRIMINAL CASE NO.: |
| | : | 1:14-CR-00176-01-RWS-JSA |
| TRAVIS SENTALL ROBINSON | : | |
| | : | |
| Defendant | : | |

## ORDER AND REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion to Suppress Evidence, Motion to Suppress Statements and his First and Second Motions for Bill of Particulars [15] [16] [17] [20]. For the reasons that follow, the undersigned **DENIES** the Motions for Bill of Particulars and **RECOMMENDS** that the Motions to Suppress be **DENIED**.

## PROCEDURAL BACKGROUND

On May 15, 2014, the grand jury returned a five-count Indictment [1], charging Defendant Travis Sentall Robinson with one count of conspiracy to commit sex trafficking of children, in violation of 18 U.S.C. §§ 1594(c), 1591(b)(1) and 1591(b)(2); two counts of sex trafficking, in violation of 18 U.S.C. § 1591(a), (b)(1) and (b)(2); and one count of coercion or enticement of a minor female, in violation of 18 U.S.C. § 2423(a).

On May 28, 2014, Defendant filed a Motion to Suppress Statements [16] and

Motion to Suppress Evidence obtained during his arrest [17]. The Court held an evidentiary hearing on July 30, 2014 [27]. The transcript from this hearing was filed on August 11, 2014 [36] ("Tr"). Defendant stated at the conclusion of the evidentiary hearing that he is no longer pursuing his Motion to Suppress Evidence [17]. Tr. at 85-87. The Government filed its post-hearing brief on the remaining motion, that is, the Defendant's Motion to Suppress Statements, on August 27, 2014 [45]. After receiving a continuance, the Defendant was permitted to file a post-hearing brief by September 30, 2014 [55]. No such brief was filed. Thus, the Court considers the Motion to Suppress Statements [16] to be fully-briefed as of October 1, 2014.

I. **REPORT AND RECOMMENDATION ON THE MOTIONS TO SUPPRESS**

### FACTUAL BACKGROUND

The early afternoon on May 14, 2014, Detective Nicholas Mercado, an Atlanta Police Department Vice Detective with the FBI's Metro Atlanta Task Force for Exploited Children (MATCH), was assigned to surveille Defendant. Tr. at 5. Detective Mercado, along with the surveillance team which included the Gwinnett Police Department and FBI, were in unmarked vehicles. Tr. at 7-8. The purpose of the surveillance was to keep track of Defendant in anticipation of the issuance of a federal arrest warrant for human trafficking. Tr. at 15, 34. Around

1:00 pm on this day, Detective Mercado observed Defendant driving a black Chrysler 300 towards I-85 southbound from his home in Lawrenceville, Georgia. Tr. at 6. Detective Mercado also observed Defendant traveling southbound on I-85 at 80 to 90 miles per hour and weaving in and out of traffic. *Id*. Defendant was in the HOV lane, he then cut across three to four lanes of traffic, almost creating multiple traffic accidents, in order to take the Courtland exit. Tr. at 7. Detective Mercado was unable to make a traffic stop because he was in an unmarked vehicle and did not have any emergency lights or sirens. Tr. at 7-8. Detective Mercado continued to follow Defendant off the Courtland exit and observed him cut across three lanes of traffic to make a left turn into the roundabout of the Hilton Hotel. Tr. at 8. By doing this, Defendant nearly got hit by two vehicles and nearly hit a pedestrian that was crossing on the sidewalk. *Id*.

 Detective Mercado was the lead law enforcement to arrive at the Hilton behind Defendant. Tr. at 8-9. Upon his arrival, Detective Mercado could hear the sirens of marked units on the way. Tr. at 10. At that time, two APD officers on motorcycles were fighting their way through traffic with their lights and sirens. *Id*. Defendant parked his car in the roundabout and began to walk into the hotel. Tr. at 9. A passenger in Defendant's vehicle noticed the officers and yelled out, "12," a common street term for police, which caused Defendant to walk into the hotel at a high pace. Tr. at 11. Detective Mercado had on a balaclava-style mask to disguise

his identity and pursued Defendant into the hotel. *Id*. He also wore his APD tactical vest, which has a detective badge on the left shoulder and clearly marked with the words, "Police", in the chest area. Tr. at 12, Ex. 2. Detective Mercado had a gun in his holster, but never drew his firearm during his pursuit of Defendant. Tr. at 11.

Detective Mercado followed Defendant into the hotel lobby while yelling, "Stop, police". Tr. at 12-13. As Defendant turned around, Detective Mercado grabbed and detained him. Tr. at 13. Defendant was compliant. *Id*. Detective Mercado put Defendant in handcuffs and walked him back through the front doors of the lobby to the roundabout where their cars were parked. Tr. at 12-13. Detective Mercado asked Defendant for his name and told him that he was placed under arrest for traffic violations. Tr. at 14. The arrest occurred at approximately 2:00 pm Tr. at 15.

By the time Detective Mercado emerged from the hotel with Defendant, APD motorcycle units and police vehicles had arrived at the Hilton. *Id*. Agent Whiteman arrived at the scene in an unmarked vehicle shortly after 2:00 pm *Id*. Agent Whiteman's role was to help coordinate the efforts of the task force and to remain in communication with the FBI case agent regarding efforts to obtain the indictment. Tr. at 35. Agent Whiteman advised Detective Mercado to turn Defendant over to the uniformed officers and return to his vehicle. Tr. at 47.

Approximately at 2:20 pm, Agent Whiteman received a telephone call from

Special Agent Fonseca to say that the indictment had been signed and was at that point authorized to arrest Defendant on federal charges. Tr. at 37, 55. Agent Whiteman approached Defendant, who was in handcuffs standing outside of his vehicle, and told him that he was now being placed under arrest for sex trafficking. Tr. at 37. Agent Whiteman was in plain business casual clothes, with his FBI badge around his neck and his firearm covered. Tr. at 38. Agent Whiteman told Defendant that he was not going to ask him any case-related questions and that he was going to transport him to the Atlanta Police Department where he would have a chance to talk to the case agent and tell his side of the story. *Id*. Defendant appeared to be coherent and concerned about his situation. *Id*.

Agent Whiteman identified the three passengers who had been in Defendant's car, Ashley Robinson, Giulianna Zumbo and Oyarmma Robinson, and Agent Fonseca asked that they all be transported to APD headquarters. Tr. at 39-40. Agent Whiteman approached Defendant, who at this time was sitting in the rear of an APD car, to inquire about the status of the Chrysler 300 that was parked outside of the Hilton. Tr. at 40. Defendant told Agent Whiteman that it was a rental vehicle and that he was the registered driver. *Id*. Defendant asked if the vehicle could be turned over to someone and Agent Whiteman responded that the vehicle was going to be seized as evidence pending a search warrant. *Id*. Agent Whiteman then called a towing company and arranged for the Chrysler to be towed to the FBI

headquarters. Tr. at 41.

At approximately 3:15 pm, Agent Fonseca arrived at APD. Tr. at 55. When Agent Fonseca arrived, Defendant and his three passengers were already in separate interview rooms. Tr. at 56. Defendant was in an interview room alone and was being video recorded. Tr. at 60, Ex. 4. Before being interviewed, Defendant is observed without handcuffs, laying his head on his arms with his arms on the table trying to get comfortable. Tr. at 60 -61, Ex. 4 at 3:29:13.

Agent Fonseca interviewed the three passengers before interviewing the Defendant so that the passengers could be released from APD. Tr. at 62. Defendant's brother, Oyarmma Robinson, was interviewed first and the interview lasted approximately 15 minutes. Tr. at 57. Around the conclusion of this interview, Defendant was heard yelling from another room that he needed to use the bathroom. Tr. at 61.

At approximately 3:50 pm, Agent Fonseca responded to Defendant's bathroom request and unlocked his leg irons and placed him in handcuffs, left the interview room and took him to the bathroom. Tr. at 61, Ex. 4 at 3:49-3:52. Agent Fonseca introduced himself to the Defendant and told him that he would be back to conduct the interview. Tr. at 62.

At approximately 4:10 pm, Agent Fonseca interviewed the two other passengers, Ashley Robinson and Giulianna Zumbo, for about an hour and Task

Force Officer Nelson interviewed them for about 30 minutes. Tr. at 62-63. During this time, the Defendant is observed on video sitting in the interview in various sleep positions. Ex. 4, 3:29 to 3:44 pm.

After the interview with the two passengers, Agent Fonseca asked Defendant if he was hungry. Tr. at 63. At about 6:45 pm, Agent Fonseca returned with Defendant's food and gave him a few minutes to eat. Tr. at 64. The video depicts Defendant eating some of his food, going through the contents of his wallet, taking something out of his wallet, ripping it in half and placing one half back into the wallet and the other half was placed inside of the burger. Tr. at 64, Ex. 4 at 6:58:32.

At approximately 7:10 pm, Agent Fonseca and Task Force Officer Nelson entered the Defendant's interview room. Tr. at 64. Agent Fonseca began the interview by getting the Defendant's biographical information. *Id*. Defendant asked questions about the charges he was facing. Tr. at 66. Agent Fonseca responded that he needed to get more biographical information before discussing that. Tr. at 64-65. Defendant asked Agent Fonseca if the rental car could be returned because he did not want them to charge his account. Tr. at 66. Agent Fonseca confirmed the name of the rental company and assured Defendant that he would call them the next day to pick it up so that the account would not incur additional charges. *Id*.

Approximately at 7:25 pm, Agent Fonseca began the advice of rights

process. Tr. at 67, Ex. 4 at 7:24:54. Agent Fonseca asked the Defendant to read each of the rights aloud. Tr. at 67. After reading the rights, Defendant signed the form and Agent Fonseca and Task Force Officer Nelson signed the form as witnesses. Tr. at 67, Ex. 5. Following the execution of the *Miranda* form, Agent Fonseca began discussing the charges and the Defendant's criminal history. Tr. at 68.

The interview concluded approximately at 10:02 pm. Ex. 4 at 10:02. After the conclusion of the interview, Agent Fonseca took the Defendant to the booking room, took his photograph, fingerprinted him, did his DNA kit and drove him to the Atlanta Pretrial Detention Center. Tr. at 71. Defendant inquired about the possibility of being released on bond for his cooperation. *Id.* Agent Fonseca told Defendant that he may be able to give law enforcement information on other people who are exploiting children, but that getting out on bond was not likely due to the charges he was facing. Tr. at 79.

From the time of Defendant's initial arrest around 2:00 pm through the conclusion of his interview with law enforcement, around 10:00 pm, there is no indication that any member of law enforcement threatened him or made any promises to him. Tr. at 16, 41 and 71. During the interview, Defendant never asked to stop the interview or speak with an attorney. Tr. at 69. There is no indication that Defendant was under the influence of drugs or alcohol at the time of his arrest

and interview. Tr. at 16, 70. Defendant appeared to be relaxed, calm and completely coherent with all interactions with law enforcement. Tr. at 38.

## ANALYSIS

In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that when a defendant objects to the introduction of a statement to law enforcement as involuntary, due process requires the trial court to make an independent determination that the statement was voluntary before it may be heard by the jury. A two-part inquiry determines the admissibility of a self-incriminating statement. First, the court must consider whether the Government complied with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Second, the court must consider whether the statement was voluntary. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994).

While the agents had some brief conversations with Defendant at the Hilton hotel before he was transported to APD for booking and interrogation, the Government has represented that it does not seek to use any of those statements at trial. Thus, the Court focuses on whether the Government has met its burden to prove compliance with *Miranda* and voluntariness as to Defendant's statements while in custody at APD.

### A. The Interrogating Agents Complied With *Miranda*

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is

in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id.* at 475. The Supreme Court instructs us to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

The officers began questioning Defendant at APD began at approximately 7:10 pm, although did not administer *Miranda* warnings until after 7:20 pm. The Court has reviewed the approximately 10 minutes of pre-*Miranda* questioning and agrees with the Government that it consists of biographical questions routinely administered as part of a booking procedure. Such questioning is excepted from the *Miranda* requirement. *See Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991).

After the initial biographical questioning, the agents clearly went over Defendant's *Miranda* rights with him, and presented him with a written Advice of

Rights Form, which Defendant read aloud and signed, indicating his waiver of his *Miranda* rights. Tr. at 67, Ex. 4 (videotape) at 7:24:54; Ex. 5 (signed waiver form).

The record shows that Defendant's waiver of his rights was voluntary. Defendant responded appropriately to the agents' questions during the *Miranda* discussion and during the interview generally. Defendant was reasonably well educated, having graduated from high school and attended (although did not graduate from) a technical college. Tr. at 66-67. The agent testified and the video recording shows that Defendant was coherent and calm. Tr. at 38. Defendant expressed some concern that as a result of his arrest, a passenger in his car would not make a scheduled flight that afternoon. *Id*. There is no indication in the record that the agents used that concern to coerce waiver of his rights; to the contrary, the agent began the interview by informing Defendant that unfortunately the passenger missed her flight but would hopefully be able to reschedule with a modest penalty for the following day. *See* Ex. 4 at 7:12:30 - 7:13:30 pm. The interviewing agent did not otherwise appear to make any verbal or physical threats to induce waiver. The agent began the interview only after providing Defendant with food and an opportunity to use the restroom. Tr. at 61-64. And far from involuntarily speaking about the facts of the case, Defendant made various exculpatory claims during the interview, specifically denying knowledge that a particular alleged sex trafficking

victim was being prostituted. *See* Ex. 4 at 9:30-9:35, 9:37, 9:56.

In short, the record shows that Defendant's waiver of this rights was voluntary and that the agents engaged in no improper coercion or other tactics to overpower Defendant's free will.

### B. Robinson's Statements At The APD Interview Were Voluntary

In addition to its compliance with *Miranda*, the Government must also show that the Defendant's statements were made voluntarily. Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *Jones*, 32 F.3d at 1516; *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Although this inquiry focuses on the voluntariness of the Defendant's statements, as opposed to the specificity of Defendant's *Miranda* waiver, similar considerations generally apply. Thus, for all the same reasons as explained above, the Court finds that Defendant's statements were voluntarily made. The Court in

this regard has considered the somewhat lengthy duration of the interview itself – approximately 2.5 hours – which occurred after several hours in which Defendant waited in the interview room. The Court does not consider these circumstances to be coercive on the facts of this case. The agents were occupied with interviewing the passengers of the car first, but yet still checked in with Defendant several times, including at around 3:10 pm, at which time they allowed him to use the restroom, at 5:45 to ask whether he wanted them to order food for him, and then around 6:45 to deliver his food to him. *See* Tr. 61-63. In the meantime, it appeared that Defendant used some of the waiting time to sleep. *Id.*

The record thus firmly establishes that Defendant's statements were made voluntarily and in the absence of coercion or intimidation. Defendant's Motion to Suppress Statements [16], along with the Motion to Suppress Evidence [15] that the parties agree is moot, should be **DENIED**.

## II. <u>ORDER ON MOTION FOR BILL OF PARTICULARS</u>

Defendant's original Motion for Bill of Particulars [17] was focused on Count Two of the Indictment, which alleges that Defendant committed sex trafficking of a juvenile in violation of 18 U.S.C. § 1591(a). This Section includes two subsections – (a)(1)[1] and (a)(2)[2] – which specify different ways in which the

---

[1] Section 1591(a)(1) creates a federal crime for anyone who "in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides,

statute can be violated. Defendant argues that the Government must be ordered to file a bill of particulars specifying which subsection it is proceeding under. Also, Defendant notes that Count Two references two separate penalty provisions – § 1591(b)(1), which provides for a mandatory minimum imprisonment sentence of 15 years when force, fraud or coercion are used or where the victim is under 14 years old, and (b)(2), which otherwise provides for a mandatory minimum imprisonment sentence of 10 years. Thus, Defendant argues that he is entitled to a bill of particulars specifying what penalty provision the Government is asserting.

At the pretrial conference on May 30, 2014, Plaintiff indicated that it would supplement its Motion for Bill of Particulars by June 6, 2014 [18]. Plaintiff's subsequent filing, on June 9, 2014, was styled as a "Second Motion for Bill of Particulars," although it appears to supersede the first Motion [20]. In the Second

---

obtains, or maintains by any means a person . . . . knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."

[2] Section 1591(a)(2) creates a federal crime for anyone who "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."

Motion, Defendant argues that

> Counts one, two, four and five allege multiple means were utilized in committing the offenses. Specifically, each of these counts allege that Mr. Robinson used 'force, threats of force, fraud, coercion, and any combination of such means' to commit these offenses. It seems reasonable to believe that the government presented evidence as to which of these means were employed when the case was presented to the grand jury. In order to properly defend Mr. Robinson, it is essential that the defense be given greater specificity from the government as to which means were employed in the above-described counts.

[20] at 2.

The purpose of a bill of particulars is threefold: "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985) (citations omitted). A bill of particulars, properly viewed, supplements an indictment by providing the defendant with information necessary for trial preparation even if not required to be included in the indictment itself. *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (italics in original). Even if in providing those details in a bill of particulars, the Government's evidence or theories are somehow disclosed, the bill of particulars is still proper if necessary to allow adequate trial preparation. *United States v. Thevis*, 474 F.Supp. 117, 123 (N.D. Ga. 1979); *United States v. Smith, supra*; Wright, Federal Practice and Procedure Criminal 2d § 129.

Generalized discovery, however, is not an appropriate function of a bill of particulars and is not a proper purpose in seeking the bill. *Id.,* at 1442; *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981). Similarly, the Eleventh Circuit has held that a bill of particulars should not "automatically [be] accorded the status of a supplement to an indictment." *Anderson*, 799 F.2d at 1442. Furthermore, a defendant is not entitled to a bill of particulars "with respect to information which is already available through other sources," including discovery. *Martell*, 906 F.2d 555, 558 (11th Cir. 1990); *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.), *modified on other grounds*, 801 F.2d 378 (11th Cir. 1986).

Defendants' Motions for Bill of Particulars do not meet these standards and are therefore denied. To the extent the original Motion [17] was not superseded by the Second Motion [20], it would be denied anyway as meritless. While Count Two of the original Indictment [1] did not specify a subsection of § 1591(a) to be charged, the words of the Count itself only alleged the elements of Section 1591(a)(1). In any event, the question is now moot, because the Government has since obtained a Superseding Indictment [59], which now clarifies that Count Two alleges a violation of Section 1591(a)(1). That the Count continues to reference both penalty provisions – (b)(1), with its 15-year mandatory sentence, and (b)(2), with its 10-year mandatory sentence – does not otherwise warrant a bill of particulars. This simply puts Defendant on notice of the Government's contention

that the aggravated 15-year sentence under (b)(1) applies, but that in the alternative, assuming the additional aggravating facts required by (b)(2) cannot be proven, at least a 10-year sentence applies under (b)(2). This is not unclear, and the Government is entitled to pursue these two alternatives.

The Second Motion for Bill of Particulars is also meritless. First, the Government is entitled to allege multiple means of committing an offense. Here, it did so, clearly informing Defendant of the allegation that he used force, threats of force, coercion and fraud to induce the alleged acts of prostitution. Defendant's demand for further explanation or particularization of how the Government believed he did these things is tantamount to a demand for the Government's evidence, which is not the proper subject of a bill of particulars.

Second, the Motion ignores that the Indictment includes specific allegations of fact as to Defendant's role in the sex trafficking conspiracy, including that he "committed acts of violence" against the alleged victims who were forced to engage in prostitution. *See* Indictment [1] ¶¶ 6-7. These allegations provide additional detail as to how Defendant threatened and coerced the victim of Count Two but the Motion for Bill of Particulars does not consider this. Third, the Motion is moot because the Indictment to which it was addressed has now been superseded, and the Superseding Indictment includes even more allegations of fact as to Defendant, including direct allegations stating that Defendant "forced or

attempted to force" various specific victims to engage in prostitution, including the alleged victim of Count Two.  *See* [59] ¶¶ 1-10.

Moreover, Defendant's largely perfunctory argument does not explain in any detail why he needs the information he seeks and/or why that information is not available from other sources, including discovery.  Defendant rather simply asserts that he is entitled to a bill of particulars because "it seems reasonable to believe" that the Government presented some more details to the grand jury.  This is not the standard under Rule 7(f).  Indeed, the Government represents that it has provided discovery to the Defendant that further elucidates the basis of the charges against him.  Response [24] at 2-3.  Defendant does not respond or otherwise explain why he still needs a bill of particulars notwithstanding the discovery.

Accordingly, Defendant's Motions for Bill of Particulars [17] [20] are **DENIED**.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motions for Bill of Particulars [17] [20].  The Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence [15] and Motion to Suppress Statements [16] also be **DENIED**.

**IT IS SO ORDERED** this 15th day of October, 2014

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE