**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| TRAVIS SENTALL ROBINSON, | : | MOTION TO VACATE |
| Movant, | : | 28 U.S.C. §2255 |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:14-CR-176-RWS-JSA-1 |
| UNITED STATES, | : | |
| Respondent. | : | CIVIL ACTION NO. |
| | : | 1:21-CV-4730-RWS-JSA |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Through counsel, Movant Travis Sentall Robinson has filed the instant motion to vacate pursuant to 28 U.S.C. §2255, and seeks to challenge his convictions and sentences following a jury trial in the Northern District of Georgia. (Doc. 391).

I.    Procedural and Factual History

A.    Facts

The testimony at trial demonstrated that Movant operated a sex trafficking ring, which he called the "Queen of Diamonds" ("QOD") and deemed himself the "King of Diamonds" ("KOD").[1]  (Doc. 272 at 10, 24; Doc. 274 at 11; Doc. 279 at 136; Doc. 280 at 50).  Movant recruited young women from around the country through different means, that is, via private messages on Instagram, introduction by

_____

[1]    The victims mostly referred to Movant, however, as "Trigga" or "Trigg," derived from his nickname, "Triggaplay."  (Doc. 272 at 10, 24; Doc. 274 at 11; Doc. 279 at 136; Doc. 280 at 50).

friends of the victims, Backpage ads,[2] and various other ways.  (Doc. 272 at 11-15, 17-18; Doc. 273 at 26-28; Doc. 274 at 137-140, 144, 160-62, 162-63, Doc. 276 at 13-18; Doc. 279 at 106-108).  When recruiting victims, Movant would use social media to promote the QOD and highlight his access to wealth, celebrities, and the music industry.  (Doc. 272 at 13-15, Doc. 273 at 28-29, 132-143, Doc. 274 at 152-155, 159; Doc. 275 at 14, 35-36; Doc. 279 at 108-109, 115).  His social media posts included pictures from nightclubs with captions implying that the QOD members were "party girls" and models.  (Doc. 273 at 142-143).

Once he recruited his victims, he would take them to music studios, introduce them to recording artists, take them shopping for clothes, pay for meals and drinks at clubs, and cultivate sexual relationships with them.  (Doc. 272 at 13-15, 20-22; Doc. 273 at 31-34; Doc. 274 at 164-65, 163-64; Doc. 275 at 49; Doc. 276 at 21-22, 26; Doc. 279 at 116-120).  The victims soon learned that the QOD was not about party promoting, modeling, or even being Movant's girlfriend, but instead was a commercial sex operation.  (Doc. 272 at 25-26; Doc. 273 at 35-36; Doc. 275 at 6-8; Doc. 279 at 126-136).  Because Movant would tell the victims they were indebted to him, and/or the victims were far from home, had no money, and felt like they had no choice, they began to engage in commercial sex acts.  (Doc. 272 at 30; Doc. 275 at 11; Doc. 279 at 120, 128-29, 150).

---

[2]     Backpage is a website advertising prostitution services.  (Doc. 271 at 19-20).

Using their pictures, Movant would create and pay for Backpage ads for the victims who "worked" for him, provided them with phones associated with numbers corresponding to their ads, and expected them to answer the phone for "dates." (Doc. 271 at 19-20; Doc. 275 at 93-94; Doc. 276 at 44; Doc. 277 at 53; Doc. 279 at 145; Doc. 280 at 20; Doc. 281 at 124-125). He tracked the victims' phones with an app called "SMS Tracker" and was able to view their text messages, location information, and call logs in real time, and he also could review their deleted messages. (Doc. 272 at 84-107; Doc. 277 at 92; Doc. 279 at 61; Doc. 280 at 19).

The victims were required to make a certain amount of money each night, and Movant provided them with the drug Molly to help them stay awake. (Doc. 276 at 88-89; Doc. 279 at 138, 154, 156-57, 162). Movant also demanded that the victims follow certain rules, that is, to: give Movant all of the money they earned; ask permission to use money on food or personal hygiene; never sleep while their ads were posted on Backpage.com; never turn down a call; never leave hotel rooms without texting him; communicate when a date called, including how much time that date purchased and when he left; never speak to other pimps, their associates, or male friends; and show respect and loyalty. (Doc. 270 at 160-1611; Doc. 275 at 9, 15-17, 60; Doc. 276 at 204-207; Doc. 277 at 6, 133-134; Doc. 279 at 142-145, 157, 162-164; Doc. 280 at 22-24). And to prove their loyalty, Movant brought several of the victims to get a QOD tattoo. (Doc. 271 at 24-26; Doc. 276 at 198-200; Doc. 279

at 138-140). Movant also required the victims to work even when they were menstruating, which meant that they had to insert makeup sponges in their vaginas during that time. (Doc. 275 at 10; Doc. 277 at 19-20; Doc. 279 at 158-159).

If the victims violated Movant's rules, or even if they just did something Movant did not like, Movant would use physical violence by "slapping" them, "beating them up," or worse, which was intended to, and did, make all of the victims afraid of him. (Doc. 273 at 55-56; Doc. 275 at 13-14, 21-26, 35-43, 71, 154-155; Doc. 276 at 206-207; Doc. 277 at 134-35; Doc. 279 at 164-165, 182, 197-198; Doc. 280 at 20, 54-62). Ladrigus Stuckey, a/k/a "Dreek," helped Movant enforce these rules, many times also with violence. (*See, e.g.,* Doc. 273 at 50-57). On several occasions after Movant assaulted the victims, he also would punish them by taking away their phones and IDs. (Doc. 275 at 35, 41; Doc. 277 at 91). Examples of violence or threats of violence about which the victims testified included:

K.C.: after K.C. turned down a customer, Movant choked and hit her [Doc. 279 at 182; 71, 73, 178-179, Doc. 280 at 142-143];

L.W.: after Movant told L.W. to order food and she told him that she did not want to eat, he pulled her by the hair, threw her to the ground, punched her – causing her to have a black eye – banged her head into the ground, and took away her iPad and phone;

the next day when L.W. refused to talk to Movant he punched her again, this time on the other side of her face with a closed fist;

another time when L.W. did something that Movant did not like, he pulled her hair and shoved her to the ground;

4

yet another time Movant warned L.W. by text that she should calm down because she "know[s] how ugly it can get" – which L.W. testified that she knew he meant that if she did not watch her attitude he would hit her [Doc. 275 at 35-43, 60];

**D.A.:**       after D.A. tried to escape but returned to retrieve her belongings, Movant, with Stuckey's help, dragged D.A. from the front door of the hotel into the bathroom, choked, punched, and slapped her, and yelled at her to shut up and stop screaming [Doc. 273 at 50-57];

**M.M.:**       Movant was not happy with M.M. because she went on an "outcall" with another QOD girl and ended up taking that girl's date, and when M.M. told Movant that she did not understand what the big deal was he backhanded her and told her he hit her because she had an attitude and was disrespectful;

another time after Movant found out that M.M. made a derogatory comment about him, he backhanded her "over and over and over again," approximately six times, after which her face and lips were swollen [Doc. 276 at 90-100];

**K.G.:**       Movant punched co-defendant Koren Gibbs with his fist on several occasions:

the first time occurred when Koren found out Movant was with another girl and argued with him by text, Movant punched her, told her he did not love her and that he would show her "gorilla pimping,"[3] which resulted in Koren having bruises all over her body and head, and she felt like he had broken her shoulder;

another time because Koren fell asleep after a date, Movant hit her and threatened her that if she tried to leave him he would find

---

[3]       A gorilla or guerilla pimp is defined as a pimp who is physically violent toward the prostitutes he manages. *See* Gorilla Pimp Definition, WordSense Online Dictionary, *available at* https://www.wordsense.eu/gorilla_pimp/.

her, while showing her that his phone contained her mother's address;[4]

on one occasion when they were in the car together Koren complained to Movant that she thought it was unfair that he was allowing another girl to get away with hardly working, Movant twice punched her in the face, and then when they went inside the house he restrained her, choked her, punched her, and kicked her while she was on the ground; and

when Koren saw Movant with another girl and called and yelled at him, he forced her into the bathroom where he beat her up while she was begging him to stop [Doc. 276 at 207; Doc. 277 at 20-25, 117-119, 122-126, 129-133; Doc. 278 at 31-37]; and

**A.W.:**       when A.W. let out a cry because she was in the room and hearing Movant assault Koren in the bathroom, Movant punched her twice, resulting in a black eye [Doc. 280 at 54-61].

Koren also testified on another occasion when Movant felt that he was being disrespected, he held a "meeting" with the victims, yelled at them that they were not allowed to listen to anyone but him, and punched three of them.  (Doc. 278 at 31-37).  During that same meeting when one of the victims had "gotten smart" with Movant, Stuckey grabbed her, forced her into the bathroom with Movant, and held her down in the bathtub, after which she came out of the bathroom with bruises on her face and her eye shut.  (*Id.* at 35-36).

The jury also heard evidence from Investigator Nelson, a Task Force Officer with the FBI's child sex trafficking task force.  (Docs. 271, 273, 274, 281).

---

[4]       This threat was especially intimidating to Koren because her mother's house is where she stayed after she previously had left Movant.  (Doc. 277 at 30).

6

Investigator Nelson testified that in 2014 he responded to a hotel room in Gwinnett County where he encountered A.G. – the named victim who did not testify at trial – who seemed "shaken" and "scared to leave the room," and who had visible injuries. (Doc. 273 at 177-79). At some point after the authorities interviewed A.G., they arranged for her to be placed in an outreach program for help. (*Id.* at 180). Movant's phone and Facebook records showed that the same night after Investigator Nelson's encounter with A.G., Movant searched for A.G.'s name on social media and deleted their communications and her Backpage ad. (*Id.* at 181-182, 188-189; Doc. 274 at 31).

Although Movant rented a house in Lawrenceville where the victims stayed, he often arranged for the QOD victims to travel throughout the United States, including Georgia, North Carolina, South Carolina, Florida, Alabama, Mississippi, Indiana, Illinois, and New York, for the purpose of engaging in commercial sex. (PSR ¶¶18, 19). On one such excursion, in February of 2014 Movant organized a trip to New Orleans during the NBA All Star Weekend. (Doc. 278 at 11; Doc. 280 at 68-69). During that trip Koren and J.R. were arrested by the Louisiana State Police ("LSP") in a prostitution sting, and Movant and Stuckey were arrested on pandering charges. (Doc. 278 at 18-20; Doc. 280 at 73). The LSP seized several cell phones, including Movant's iPhone and a phone belonging to A.W. (Doc. 278 at 18; Doc. 280 at 14). Movant's counsel used an extraction from A.W.'s cell phone

at length while cross-examining A.W. at trial, but neither party used evidence from Movant's phone at trial.  (Doc. 278 at 18; Doc. 280 at 14).

A.W. testified at trial that she cooperated with the authorities in New Orleans by providing a statement and disclosing Movant's physical abuse, after which she went back home to her family in Georgia while Movant was still in jail.  (Doc. 280 at 74-79).  The Government also presented evidence of Movant's efforts to try to persuade A.W. to recant her statement against him.  (*Id.* at 83-88).

After Movant was arrested on the federal warrant in Atlanta in 2014, federal agents seized and searched his iPhone, which contained communications from approximately April to May of 2014 leading up to his arrest, and which provided multiple exhibits at trial.  (Doc. 273 at 184-185).  The Government also presented evidence from the iPhone as to how Movant controlled the QOD enterprise and recruitment of other victims, his web history including frequent access to Backpage.com (for posting the victims' ads), Priceline.com (for reserving hotel rooms), and Gizmoquip (to track all of the activity on the victims' phones).  (Doc. 273 at 186).  Investigator Nelson also testified about excerpts from Movant's phone, including multiple text messages between Movant and other persons in which he bragged about his status as a sex trafficker, gave advice to aspiring traffickers about how to control their victims, and recruited other victims to the QOD.  (Doc. 274 at 7-29).  Throughout the trial, Movant did not dispute that he was a pimp or that he

used physical violence against the victims; instead, his defense was that the victims willingly engaged in prostitution with him, which would not constitute a federal, crime.  (Doc. 282 at 44, 46, 52, 58).

B.    Procedural History

1.    Before Trial

On September 24, 2014, a grand jury in the Northern District of Georgia returned a superseding indictment against Movant, Stuckey, and Koren, and charged them with multiple sex trafficking violations.[5]  (Doc. 59).  Specifically, Count One charged Movant, Stuckey, and Koren with conspiracy to commit a sex trafficking offense by force, threats of force, fraud or coercion as to seven victims – J.R., D.A., A.W., K.C., A.G., and M.M. – and in reckless disregard of the fact that M.M. was younger than eighteen years old, in violation of 18 U.S.C. §§1591(a), (b)(1), (b)(2), and (c).  (Id.).

Counts Two and Three charged Movant with substantive sex trafficking offenses relating to M.M., a minor, in violation of 18 U.S.C. §§1591 and 2423(a).  (Id.).  Counts Four through Nine charged Movant with substantive offenses of sex trafficking involving "force, threats of force, fraud, and coercion, and any combination of such means" in relation to victims J.R., D.A., A.W., K.C., L.W., and

---

[5]    Stuckey was indicted for his role as the "enforcer" for the organization for his actions in preventing the victims from trying to leave.  (Doc. 59 at 2).  For her part, Koren helped Movant recruit and keep the victims in the QOD.  (Id.).

9

A.G., in violation of 18 U.S.C. §§1591(a)(1) and (b)(1).  (*Id.*).  And finally, Counts Ten, Eleven, and Twelve charged Movant, aided and abetted by Koren, with knowingly obstructing the enforcement of federal sex trafficking laws in violation of 18 U.S.C. §1591(d).  (*Id.*).

Both Stuckey and Koren entered guilty pleas before Movant's trial.  (Docs. 35, 120).  During pretrial and trial proceedings, Movant was represented by Suzanne Hashimi and Jeffrey L. Ertel with the Federal Defender's Office.

### 2.    Trial

Movant's jury trial ran from January 11 through February 1, 2016.  (Docs. 188, 189, 190, 196-99, 202, 204, 207-08, 210-11, 213, 216, 270-285).  During the trial, Koren and five of the victims – M.M., K.C., A.W., D.A., and L.W. – testified about their experiences with the QOD.  (Doc. 272 at 10, 24; Doc. 274 at 11; Doc. 279 at 136; Doc. 280 at 50).  Stuckey did not testify at Movant's trial.

After the Government rested, Movant requested a directed verdict on all counts pursuant to Fed. R. Crim. P. 29.[6]  (Doc. 281 at 66-86).  The Court granted Movant's Rule 29 motion as to Count Eleven, the obstruction charge relating to M.M.  (*See* Doc. 282 at 99).  At that time the Government dismissed Count Four, the substantive sex trafficking count as to J.R., and also removed J.R. from the

---

[6]    Rule 29(a) provides, *inter alia*, that after the Government closes its evidence, or after the close of all of the evidence, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

conspiracy charge in Count One.  (Doc. 217; Doc. 281 at 66, 195).  On February 1, 2016, the jury returned a guilty verdict on all of the remaining counts.  (Doc. 217). As to Count One the Court used a special verdict form, which required the jury to indicate whether it unanimously found Movant guilty or not guilty as to each named victim of the conspiracy, and the jury found Movant guilty of conspiracy to traffic five victims but not guilty as to two – A.G. and A.W.  (Doc. 217 at 1-2).

### 3.    Post-Trial Proceedings

Before sentencing, Movant alerted the Court that he had received a letter from L.W., in which she indicated that aspects of her trial testimony were untruthful because she felt pressured by the Government.  (Doc. 234).  As a result, Movant requested that sentencing be continued so that he could have an opportunity to investigate L.W.'s claims.  (*Id.*).  On December 6, 2016, the Court granted Movant's request, allowed Movant time to complete that investigation and file the appropriate motion, and subsequently granted his request for an additional extension of time. (*Id.*; Docs. 242, 245).

On January 30, 2017, Movant filed a motion to dismiss the indictment for outrageous Government conduct, or alternatively, a motion for new trial,[7] based primarily on L.W.'s assertions.  (Doc. 243).  In support of the motion Movant filed

---

[7]    For ease of reference and discussion the undersigned will refer to this motion simply as a motion for new trial.

L.W.'s declaration, which contained statements similar to what she had stated in her letter.  (Doc. 247 at 3-5).  Movant also argued that the Government failed to provide him with exculpatory evidence regarding P.G., who was not named in the indictment and who did not testify at trial.  (Doc. 243).

On June 26, 2017, the Court granted trial counsels' motion to withdraw and appointed new counsel for Movant on June 28, 2017.  (Docs. 267, 268, 269). Thereafter, the Court granted another request by Movant for new counsel [Doc. 289] and on September 28, 2017, appointed Saraliene Smith Durrett to represent him. (Docs. 290, 291).  The evidentiary hearing was rescheduled several times so that Movant could continue to investigate and prepare therefor.  (Docs. 293, 296, 303).

On February 1, 2018, Movant filed a new motion, in which he sought to significantly expand the scope of the evidentiary hearing and conduct post-conviction discovery.  (Doc. 301).  Following briefing by the parties, the Court defined the scope of the hearing to include the following issues:

(1)     whether L.W. provided false testimony at trial;

(2)     whether L.W. was pressured by the Government to provide false testimony at trial;

(3)     whether the Government failed to provide favorable evidence from L.W. to the defense;

(4)     whether the Government failed to provide favorable evidence from P.G. to the defense; and

(5)     whether the Government failed to provide favorable evidence from A.G. to the defense.

(Doc. 312).

The Court held an evidentiary hearing on April 16 and 17, 2018.  (Docs. 328, 329).  Movant called as witnesses Mr. Ertel and Ms. Hashimi, as well as Jordan Dayan, their investigator.  The Government called AUSA Phyllis Clerk, AUSA Jessica Morris, former AUSA Susan Coppedge, and FBI Special Agent Cindy Myers as witnesses.  In some combination all four of the Government's witnesses attended the Government's meetings with the relevant witnesses.

After the hearing but before the Court's decision on the motion for new trial, on April 23, 2018, defense counsel notified the Court that she had made contact with A.G., told the Court that A.G. would testify that Movant never forced her to prostitute or forced her or anyone else to take drugs, and asked the Court's permission to depose A.G. by video.  (Doc. 332 at 6-7).  After hearing Movant's proffer of A.G.'s expected testimony, the Court found that there were no *Brady* violations as to A.G. and that all proffered evidence concerning her already was in the record, and set a briefing schedule for the motion for new trial.  (*Id.*).  After the briefing and based upon the record developed at trial and the post-trial proceedings, on July 10, 2018, the Court held that the Government did not engage in misconduct, and denied Movant's motion for a new trial.  (Doc. 339).

The PSR calculated Movant's adjusted offense level of 43 and a criminal history category of IV, resulting a custody guideline range of life imprisonment. (PSR, Part D at 65).  Both Movant and the Government filed objections to the PSR. (Doc. 369 at 69-76, 89-93).  During the sentencing hearing on August 20, 2018, the Court heard from both parties on the objections and determined that the adjusted offense level, criminal history category, and custody guideline range set forth in the PSR was correct.  (Doc. 379 at 44).  After considering the §3553 factors, however, the Court significantly varied downward from the guidelines and sentenced Movant to a net total of 324 months, *i.e.,* twenty-seven years, with credit for time served and to be followed by five years of supervised release.  (*Id.* at 68; Doc. 365).

While still represented by Ms. Durrett, Movant appealed his convictions and sentences to the Eleventh Circuit and raised eight distinct issues for relief:  (1) Movant's Fifth Amendment due process rights and Sixth Amendment rights to confrontation were violated when the court permitted D.A. to testify without conducting a hearing to determine her competency to testify; and the trial court erred by:  (a) denying Movant's *Batson* challenges; (b) denying Movant's motion for mistrial based on the Government's comment in its opening statement that Stuckey had pled guilty and was awaiting sentencing; (c) admitting evidence of victims A.W.'s and K.G.'s sexual assaults and the alleged sexual assaults of other women while working for Movant; (d) excluding a videotape showing A.W. using drugs and

discussing being "turned out" before meeting Movant;[8] (e) giving the Government's modified jury instructions and refusing to give Movant's requested instructions; (f) denying defense counsel's request that the Government produce the contact information for A.G., whom the Government did not call to testify at trial; and (g) denying Movant's motion for new trial.  *United States v. Robinson*, 812 F. App'x 969 (11th Cir. 2020) (per curiam).  In an unpublished decision on July 13, 2020, the Eleventh Circuit summarily affirmed Movant's convictions and sentences, and denied his petition for rehearing on August 18, 2020.  *Id.*

Through new counsel, Movant filed the instant §2255 motion to vacate on November 16, 2021, and a supplemental brief in support thereof on December 9, 2021.  (Docs. 391, 393).  Therein, Movant raises the following claims for relief:

(1)    Trial counsel provided ineffective assistance by failing to:

    (a)    request that the Court order the Government to turn over the contact information for victim A.G. and for failing to call A.G. as a witness;

    (b)    request a "missing witness" instruction regarding A.G.;

    (c)    obtain and present evidence from Movant's phone seized during his arrest on state charges in New Orleans; and

    (d)    object to inadmissible hearsay that violated Movant's Sixth Amendment confrontation rights; and

---

[8]    To "turn someone out" is "to introduce someone to drugs, prostitution, homosexuality, etc."  *See* "Turn Someone Out" Definition, *available at* https://idioms.thefreedictionary.com/turned+out.

(2)     appellate counsel provided ineffective assistance by failing to argue on appeal that the Court erred in denying the Rule 29 motion on Count Ten because the evidence was insufficient to support that conviction.

(Doc. 391-1).  For the following reasons, it is **RECOMMENDED** that the instant §2255 motion be **DENIED**.

II.     Standard Of Review

Congress enacted §2255, authorizing convicted criminal defendants to file a motion to correct sentences that violate federal law, with the intention that the statute serve as the primary method of collateral attack on federally-imposed sentences. *United States v. Jordan*, 915 F.2d 622, 625 (11th Cir. 1990).  Pursuant to §2255, individuals sentenced by a federal court can attack the sentence imposed by claiming one of four different grounds: "(1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose such sentence; (3) that the sentence was in excess of the maximum authorized by law; and (4) that the sentence is otherwise subject to collateral attack." *Id.* (citations omitted); *see generally United States v. Hayman*, 342 U.S. 205 (1952).

"[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).  Movant must establish that the facts surrounding his claim present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Bowen v. Johnston*, 306 U.S. 19, 27 (1939).

The Court should order an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Because of the extensive post-trial proceedings in this case, the undersigned agrees with the Government that based on the record – which contains significantly more evidence than a typical §2255 motion – the Court cannot find that Movant's proffered evidence would affect the resolution of this case, as will be further discussed herein, and conclusively shows that Movant is not entitled to relief in connection with his claims. Thus, no evidentiary hearing is required. *See, e.g., Mills v. Singletary*, 63 F.3d 999, 1025 n.46 (11th Cir. 1995) ("[A]n evidentiary hearing is not necessary where the proffered evidence would not affect the resolution of the claim.").

III.   <u>Analysis</u>

A.   <u>Movant Has Not Demonstrated That Trial Counsel Provided Ineffective Assistance.</u>

1.   <u>Ineffective Assistance Of Counsel Standard</u>

The standard for evaluating ineffective assistance of counsel claims was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Green v. Nelson*, 595 F.3d 1245, 1239 (11th Cir. 2010). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 688). To establish deficiency, a petitioner is required

17

to establish that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins* 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a petitioner must prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 750 (11th Cir. 2010).

"An attorney's performance is not deficient in hindsight just because he or she made one choice versus another." *Scott v. United States*, 890 F.3d 1239, 1259 (11th Cir. 2018); *see also Willis v. Newsome*, 771 F.2d 1445, 1447 (11th Cir. 1985) ("Tactical decisions do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course."). An ineffective assistance claim should be examined based on the "'totality of the circumstances[,]'" *McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) (citations omitted), and the court may "dispose of [the] ineffectiveness claim[] on either of its two grounds." *Atkins v. Singletary*, 965 F.2d 952, 959 (11th Cir. 1992); *see also Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

The *Strickland* standard also applies to claims of ineffective assistance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Brooks v. Comm'r,*

*Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013).  To succeed on a claim of ineffective assistance of appellate counsel, a petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  *Strickland*, 466 U.S. at 689.

### 2. Ground One

In his first ground for relief, Movant claims that trial counsel were ineffective for failing to request that the Court order the Government to turn over A.G.'s contact information and for failing to call A.G. as a witness.[9]  (Doc. 391-1 at 3).  According to Movant, counsel's failure to do so resulted in actual prejudice "because A.G.'s testimony would have been exculpatory" and "in light of the scant and circumstantial evidence" that Movant forced or coerced A.G. to engage in prostitution, there is a reasonable probability that had she testified Movant would not have been found guilty of the counts related to her.  (*Id.*).

But Movant's argument is unpersuasive, as the only reason the evidence was "scant" was because A.G. was *not* called as a witness.  In fact, during the hearing on

---

[9]     During the trial, Movant's counsel asked the Government for A.G.'s contact information, and the Government responded that it was unwilling to provide that information without a Court order.  (Doc. 274 at 119).  Movant's counsel did not ask for a court order; instead, counsel argued that if the Government would not call A.G. as a witness, it should drop those counts in the indictment that related to her.  (*Id.* at 122).  Movant raised this issue in his motion for new trial as a claim that the Government's failure to disclose A.G.'s information constituted a *Brady* violation, which the Court rejected.  (Docs. 243, 339).

the motion for new trial, Mr. Ertel testified that they thought they had a pretty good chance of winning the count related to A.G. *because* she was not a witness.  (*See* Doc. 328 at 100) ("[K]nowing that [A.G.] wasn't going to be here, we thought we had a pretty good chance of winning that count.").  For that same reason, Investigator Dyan was "sort of surprised" that Movant actually was convicted of one of the counts involving A.G. since she did not testify.  (*Id.* at 93).

The undersigned first notes that "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [the court] will seldom, if ever, second guess." *Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (en banc); *accord Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).  And:

> the fact that other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.

*Ledford v. Warden, Ga. Diagnostic and Classification Prison*, 818 F.3d 600, 647 (11th Cir. 2016) (internal quotation marks omitted).  For many reasons, there is no basis for this Court to second guess defense counsel's decision not to persist with acquiring A.G.'s contact information.

According to Movant, had A.G. been called as a witness at trial, she would have testified that:  Movant got her off of drugs; he never forced her into prostitution;

she and Movant were in a relationship and any violence between them was not about prostitution but instead constituted domestic violence; she actually returned to Movant a few days after her interview with agents; and she continued to prostitute after Movant's arrest and put money on his books while he was in jail. (Doc. 391-1 at 5-6). The undersigned agrees that this testimony potentially could have been favorable to Movant.

On the other hand, had A.G. testified, her interviews with the agents would have come to light, which were replete with inculpatory evidence and consistent with the other victims' testimony. During those interviews A.G. talked extensively about Movant's physical violence toward her. She provided several examples, and described one time that was particularly brutal.[10] Specifically, Movant sent A.G. text messages pretending to be another pimp, and she responded with texts in which she said bad things about Movant – breaking at least two of his "rules." (Doc. 348 at 28-29). A.G. went on to describe to the agents how Movant beat her, stuck her head in the toilet, flushed three times, continued to hit her when she passed out, and

---

[10]   Movant claims that A.G. would have testified that it was not Movant who caused the injuries that Investigator Nelson observed when he encountered A.G. at the Gwinnett County hotel. (Doc. 391-1 at 7; Doc. 405 at 4). But during her interview with agents on July 29, 2014, A.G. specifically stated that it was after this vicious assault when she asked her son's foster parents to call 911 – which is when Investigator Nelson was called to the hotel. (Doc. 348 at 30). Thus, unlike Movant contends, it is not so definitive that the Government "knew" the injuries were caused by another woman instead of Movant.

was still hitting her when she revived consciousness.  (*Id.*).  During that assault Movant held A.G.'s phone up to her with a picture of her son, smiled, laughed, and told her that he would throw her out the window and she would never see her son again.  (*Id.* at 29-30).

A.G. also told agents that after D.A. tried to escape she saw Movant drag D.A. into the bathroom and shut the door, and while she could not actually see what was happening she knew that Movant was assaulting D.A.  (Doc. 348 at 24-25).  And at one point A.G. saw L.W. with a black eye.  (*Id.*).  All of this testimony would have been consistent with evidence from the other victims about Movant's physical violence toward them.

Likewise, the Government would have shown that Movant tracked A.G.'s calls, messages, and other information on her phone in real time, just as he did with the other victims.  As but one example, evidence would have come to light that A.G. had seen an old high school boyfriend – again in violation of Movant's rules – and immediately after the ex-boyfriend left Movant knocked on the door to A.G.'s room and when she opened the door he hit her continuously, giving her double black eyes. (*Id.* at 27-28; Doc. 301-1).

Furthermore, any testimony by A.G. that Movant helped to get her "sober" from her crack addiction and that he did not force her to prostitute would have been negated by evidence that Movant simply substituted the drugs Molly and marijuana

for crack, that if A.G. did not work or follow his rules he beat her up, and that she admitted to agents that he would not let her leave. (Doc. 301-1). And finally, even if A.G. testified that she thought she and Movant were in a relationship, during her interview with the agents she admitted that any such thought dissipated once she discovered that he was saying and doing the same things with the other victims who also thought that they, too, were in a relationship with him. (Doc. 348 at 22-24). In fact, several of the other girls testified that they also thought they loved Movant and/or that they were in a relationship with him, which Movant cultivated so they would feel indebted to him to start working. (Doc. 273 at 33; Doc. 276 at 21-22, 24, 189-193, 197; Doc. 277 at 5, 23; Doc. 278 at 162; Doc. 279 at 5, 23, 120; Doc. 281 at 136).

It is important to note that in the statute coercion is defined as "threats of serious harm to or physical restraint against any person" and "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person[.]" 18 U.SC. §1591(e)(2). Even with that part of A.G.'s testimony Movant contends would be favorable, A.G.'s possible testimony that Movant also physically assaulted her on several occasions simply constitutes more evidence that Movant's actions fit squarely within the definition of coercion. For all of these reasons, any failure by

counsel to seek a court order and to call A.G. as a witness was not an unreasonable decision.[11]  (Doc. 339 at 13-14).

The Eleventh Circuit's recent decision in *United States v. Williams*, 5 F.4th 1295, 1299 (11th Cir. 2021) is instructive.  In *Williams*, the defendant was convicted of trafficking three victims through force or coercion, and the evidence at trial was eerily similar to the facts in this case.  To that end, the evidence showed that the defendant preyed on vulnerable victims and convinced them they were a "family" so that he could manipulate them into engaging in commercial sex acts.  *Id.* at 1299. Eventually the defendant would "convince" them to prostitute, and he required them to check in with him on the phone he provided them and to tell him when the customer arrived, how much he paid, and when he left.  *Id.*  The defendant also required the victims to surrender all of their earnings to him, and he constantly monitored them through security cameras placed throughout the house.  *Id.*  If the victims failed to communicate with him, did not make enough money, or were seen as disloyal, "[v]iolence soon became the norm." *Id.*

---

[11]      Indeed, in the order denying Movant's motion for a new trial, Judge Story found that counsel likely made a "strategy decision" not to seek A.G.'s testimony because "the defense team may have believed there was a stronger chance of defeating the charges relating to A.G."  (Doc. 339 at 13-14).  And, as previously discussed herein, both Mr. Ertel and Investigator Dyan testified to that effect.  (Doc. 328 at 93, 100).  Nothing that Movant argues here changes that reasoning, as "[t]here is much wisdom for trial lawyers in the adage about leaving well enough alone." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).

In *Williams*, at least one of the victims testified that although she was terrified of the defendant because of the beatings, she thought he was her boyfriend, she believed – at least at first – that she loved him, and she only engaged in prostitution to make him happy. *Id.* at 1303. Despite that testimony, the Eleventh Circuit affirmed the defendant's convictions for causing victims to engage in commercial sex acts through force, threats of force, fraud, or coercion. *Id.* In doing so, the court described the dichotomy of the victim's testimony as a result of "a frequent tactic of sex traffickers; a 'Romeo trafficker' encourages his victims to become emotionally dependent on him and to cultivate loyalty to his 'family' of girls so that he can manipulate them into getting involved in prostitution." *Id.* at 1299. Here, the evidence at trial demonstrated that Movant used that same tactic.

Consequently, the undersigned cannot find that had A.G. testified there is a reasonable probability that the outcome would have been different. *See id.*; *see also United States v. Stennis*, No. 20-CR-0019 (PJS/BRT), 2022 WL 2312214, at *6 (D. Minn. June 27, 2022) (finding sufficient evidence of sex trafficking by force and coercion where defendant would not allow the victims to go home, he had many "rules" he imposed – such as not spending too much time or having fun with a client, giving the defendant all of their money and not talking to other pimps – and if the victims violated the rules or indicated that they no longer wanted to prostitute he would physically assault them). Movant, therefore, has not demonstrated that

counsel provided ineffective assistance by failing to seek a court order and call A.G. as a witness and, accordingly, Movant is not entitled to relief in connection with Ground One.

      3.   <u>Ground Two</u>

Along those same lines, Movant argues in Ground Two that counsel should have requested a "missing witness" instruction regarding A.G.  Were this instruction given to the jury, it essentially would have allowed the jury to infer that because the Government did not call A.G. as a witness her testimony would have been unfavorable to the Government.  *See United States v. Raphael*, 487 F. App'x 490, 500 (11th Cir. 2012) ("Under the missing witness instruction rule, '[i]f it is particularly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case,' then failure to call that witness permits an inference that the testimony would have been unfavorable to the party who refused to call the witness.") (citations omitted); *see also United States v. Davis*, 487 F.2d 112, 126 (5th Cir. 1973).

But whether the missing witness instruction even would apply requires that: (1) the witness be "peculiarly within" one party's power to produce, *i.e.,* unavailable to the other party; (2) any testimony by that witness be relevant and not cumulative; and (3) the testimony would not be adverse to the party requesting the instruction. *See United States v. Boston*, 194 F. App'x 890, 892 (11th Cir. 2006) ("The district

court is not required to give the missing witness instruction to the jury if the witness would testify against the interests of the defendant."); *Jones v. Otis Elevator Co.*, 861 F.2d 655 659 (11th Cir. 1988) (stating that to justify a missing witness instruction "the potential testimony must be relevant and noncumulative"); *see also Cannon v. United States*, No. 07-20232-Civ-COHN, 2007 WL 4616281, at \*16 (S.D. Fla. Oct. 16, 2007) ("[T]he movant has failed to meet his burden of showing that the missing witness instruction should have been given because he has not shown how these witnesses' testimony would have been favorable to him."), *report and recommendation adopted*, 2007 WL 4616281 (S.D. Fla. Dec. 29, 2007).   And perhaps most importantly, the missing witness instruction is generally disfavored, *United States v. Disantis*, 565 F.3d 354, 364 (7th Cir. 2009), "the rule of presumption from failure to produce witnesses is one which is to be applied with caution," *Wilson v. United States*, 352 F.2d 889, 892 (8th Cir. 1965), and whether to give the instruction is entirely within the Court's discretion.   *United States v. Link*, 921 F.2d 1523, 1529 (11th Cir. 1991).  In this case, Movant has not demonstrated that these requirements have been met.

Indeed, technically A.G. was not unavailable since the Government indicated that it would provide her information to defense counsel with a court order. Moreover, as discussed more thoroughly in Section III.A.2., while Movant may believe that some of A.G.'s testimony would have been favorable to him, much, if

not all, of her testimony undoubtedly would have been adverse to Movant's interests and cumulative of the other victims' testimony.  At the very least, it would not be clear which side A.G.'s testimony would benefit more therefrom.[12]

Because a missing witness instruction is disfavored, and because Movant has not shown that the requirements would have been met, Movant has failed to demonstrate that counsel's failure to request the missing witness instruction was unreasonable and/or that the Court would have granted that request.  Consequently, Movant has not shown that counsel was ineffective in this regard, and he is not entitled to relief in connection with Ground Two.  *Cf. United States v. Ramos-Gonzalez*, 775 F.3d 483, 500 (1st Cir. 2015) (finding district court did not abuse its discretion in failing to provide a missing witness instruction where, *inter alia*, it was not clear which side would have benefitted more from the witness's testimony).

4.   <u>Ground Three</u>

Movant claims in Ground Three that he received ineffective assistance of trial counsel because counsel never obtained or reviewed information from a particular phone that was seized from Movant upon his arrest in New Orleans (the "New Orleans phone"), and which, according to Movant, contained favorable evidence for

---

[12]   As Investigator Dyan testified, the defense team realized that A.G.'s testimony would have been a "mixed bag."  (Doc. 328 at 92).

his defense.[13]  (Doc. 391-1 at 9-10).  Movant has provided an affidavit in support of this claim, in which he outlines in explicit detail what alleged exculpatory messages to and from several of the victims were contained on the New Orleans phone – which, according to Movant, demonstrates how he allegedly was prejudiced by counsels' failure to obtain and extract the information therefrom.   (Doc. 406). Regardless, the Court cannot find counsels' actions in this regard were anything other than reasonable professional assistance.

Indeed, counsels' exhaustive efforts to retrieve that information from both the Government and independently from LSP are unmistakably apparent from the record.   Specifically, after the Government could not successively extract information from Movant's phones, defense counsel arranged for their own in-house IT expert to review those seized phones in the Government's possession, attempted to unlock the phones using passwords provided by Movant, and even hired an expert to conduct an independent examination of multiple phones.  (Docs. 397-1, 134, 137). When those attempts were unsuccessful, counsel also served their own subpoenas on the LSP seeking the forensic report that described the data extracted from the seized phones [Docs. 157, 173], and successfully requested a continuance of the trial

---

[13]     Because the LSP apparently seized several phones at the time of Movant's arrest, it is not clear which precise phone is the phone about which Movant complains.  Nevertheless, it appears that counsel tried to obtain information from all of those phones.

date in order to further attempt to retrieve the information.[14]  (Docs. 134, 152).  To be clear, is not discernible from the record whether counsel ever actually received any extractions from the New Orleans phone, and according to Movant, the phone is now irreparably damaged such that there is no way to retrieve any such information.  (Doc. 405 at 9).

Be that as it may, the Court cannot say that counsel's actions were deficient, as all of their exhaustive efforts were not unreasonable simply because those efforts may not have been fruitful.  Nor does the fact that counsel may have finally given up after engaging in those extensive efforts render their assistance unreasonable. *See Ledford*, 818 F.3d at 647 ("[A]n investigation into mitigating evidence is adequate if it 'comprise[s] efforts to discover *all reasonably available* mitigating evidence[.] . . .'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)) (emphasis in original); *see also Strickland*, 466 U.S. at 678, 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.] . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."); *Sullivan v. Sec'y, Fla. Dep't of Corr.*, 837 F.3d 1195, 1204-05 (11th Cir. 2016) ("Counsel's investigation does not fall below

---

[14]   Importantly, in granting the motion to continue the trial date, Judge Story noted counsels' desire "to exhaust all possibilities for extracting data from the phones."  (Doc. 163 at 3).

*Strickland*'s standard so long as 'a reasonable lawyer could have decided, under the circumstances, not to investigate . . . particular evidence.'") (quoting *Payne v. Allen*, 539 F.3d 1297, 1316 (11th Cir. 2008)); *Chandler v. United States*, 218 F.3d 1305, (11th Cir. 2000)  ("[N]o absolute duty exists to investigate particular facts or a certain line of defense. . . . Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly.").

Moreover, it is apparent from the record that counsel had, in fact, obtained text messages and other communications between Movant and the victims from some of the victims' phones, and meticulously used those communications, as well as social media posts, messages, and photographs, during cross-examination of the victims in support of Movant's theory that the victims willingly engaged in prostitution.  (*See, e.g.,* Doc. 273 at 95-96, 98-105, 120-123; Doc. 275 at 106, 112-116, 122-126, 140-150; Doc. 276 at 152-153; Doc. 278 at 110, 141, 193-196; Doc. 280 at 95, 103-109, 117, 122-123, 128-135, 148-170; Doc. 281 at 28-30).  Thus, the evidence Movant claims his New Orleans would have shown – *i.e.,* that the victims willingly engaged in prostitution with him – would have been cumulative and repetitive of the evidence counsel did obtain and present at trial *vis á vis* the victims' texts to Movant.  Consequently, Movant also cannot show prejudice in connection with this claim.  *See Williams v. United States*, 294 F. App'x 460, 463 (11th Cir.

2008) (finding counsel was not ineffective for failing to call witness because the testimony would have been cumulative to that of other witnesses); *Turner v. Crosby*, 339 F.3d 1247, 1277 (11th Cir. 2003) (holding trial counsel's performance was not deficient for failing to submit cumulative testimony to the jury during the penalty phase of the trial); *Glock v. Moore*, 195 F.3d 625, 636 (11th Cir. 1999) (concluding that "where much of the new evidence that [movant] presents is merely repetitive and cumulative to that which was presented at trial," the movant cannot show prejudice). Accordingly, Movant is not entitled to relief in connection with Ground Three.

     5.   <u>Ground Four</u>

In Ground Four, Movant argues that trial counsel should have objected to Investigator Nelson's testimony that he "was contacted by patrol units in reference to a female who basically stated that she was afraid and being abused and she was scared to leave her room." (Doc. 273 at 176). Movant contends that counsel should have objected to Investigator Nelson's statement because it constituted inadmissible double hearsay, was testimonial, and thus was clearly barred by the Confrontation Clause. (Doc. 391-1 at 12). The undersigned disagrees.

     a.   *The Sixth Amendment Confrontation Clause*

"The Sixth Amendment protects a criminal defendant's right to confront the witnesses against him." *United States v. Santos*, 947 F.3d 711, 727 (11th Cir. 2020).

The Supreme Court has held that the Sixth Amendment prohibits the introduction of testimonial statements made out of court unless the declarant is unavailable to testify and the defendant previously had an opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In *Crawford*, however, the Supreme Court did not define what constitutes a testimonial statement for purposes of the Confrontation Clause. *Id.* at 56. But the Supreme Court has since distinguished between testimonial and nontestimonial statements, the former of which would violate the Confrontation Clause.

To that end, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," and are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see also Ohio v. Clark*, 576 U.S. 237, 245 (2015) ("[U]nder our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial."). This rule has become known as the "primary purpose" test. *Clark*, 576 U.S. at 244.

Under this test, the Supreme Court in *Davis* held that a statement made in response to a 911 operator's questions are nontestimonial and therefore do not

violate the Confrontation Clause. *Davis*, 547 U.S. at 822, 827-28 (2006); *see also United States v. Hughes*, 840 F.3d 1368, 1383-84 (11th Cir. 2016) (finding 911 caller's statements, the primary purpose for which was to assist officers responding to an ongoing emergency, indistinguishable from those found to be nontestimonial in *Davis*); *Walker v. Sec'y, Dep't of Corr.*, 495 F. App'x 13, 19 (11th Cir. 2012) ("In *Davis*, the Court explained that, because the victim had called 911 as events were happening and faced an ongoing emergency, and the questions she answered were designed to resolve the emergency, her statements were nontestimonial."). While the inquiry must consider "all of the relevant circumstances," the existence of an ongoing emergency is one of the most important factors. *Michigan v. Bryant*, 562 U.S. 344, 365 (2011).

Here, similar to *Davis*, A.G.'s out-of-court statement was provided to the patrol officers who arrived at the hotel after responding to the 911 call, the primary purpose for which was to assist them in responding to an ongoing emergency. And the Government did not elicit any statements from A.G., nor did Investigator Nelson offer any testimony, regarding who was responsible for those injuries. Thus, the statement was nontestimonial and did not clearly violate Movant's Sixth Amendment rights as Movant contends. *See Davis*, 547 U.S. at 822, 827-28; *Hughes*, 840 F.3d at 1383-84; *Walker*, 495 F. App'x at 19; *see also Packer v. Jones*, No. 06-00665, CG-B, 2010 WL 7367820, at *12 (S.D. Ala. Mar. 12, 2010) (finding

deceased victim's out of court statements to persons within twelve hour period after rape and burglary were nontestimonial and did not implicate the Confrontation Clause).   Nevertheless, that finding does not end the analysis since Investigator Nelson's statement would still be subject to the traditional rules of hearsay evidence. *See Davis*, 547 U.S. at 822, 828 (clarifying that although a nontestimonial statement is not subject to the Confrontation Clause, it still is "subject to traditional limitations upon hearsay evidence").   But that analysis also does not render unreasonable counsel's failure to object thereto.

b.   *Hearsay*

Rule 805 of the Federal Rules of Evidence provides that  "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."). Thus, in determining whether a statement that contains double hearsay would be admissible, the Court must analyze each level of hearsay. *United States v. Earth*, 984 F.3d 1289, 1298 (8th Cir. 2021).

Rule 803 of the Federal Rules of Evidence provides for several exceptions to the hearsay rule, even if the declarant is unavailable.   Under Rule 803(1), "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is excluded from the hearsay rule as a present sense impression.  Likewise, an excited utterance, that is, "a statement relating to a startling

35

event or condition, made while the declarant was under the stress of excitement that it caused," also is an exception to the rules against hearsay. Contrary to Movant's argument, A.G.'s statement to patrol officers that she was afraid, was being abused, and was scared to leave her room arguably could fall within either of these exceptions.

To that end, there was evidence that Movant had severely beaten A.G. the night before, and that she was scared, shaken, and distraught.[15] (*See* Doc. 278 at 73, 176-178). It is certainly arguable from a reasonable attorney's standpoint, therefore, that A.G.'s statement to the responding officers was made while she still was under the stress of Movant's recent brutal assault upon her and thus constituted an excited utterance. *See, e.g., United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003) (stating that for an excited utterance to be admissible, "testimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset will often suffice."); *United States v. White*, No. 09-20438, 2010 WL 2105136, at *4 (E.D. Mich. May 25, 2010) (finding witnesses' statements to responding officers upon their arrival were admissible as

---

[15] As discussed in Section II.A.2, during one of her interviews A.G. described a particularly vicious assault she incurred at Movant's hands where he pushed her head into the toilet, flushed three times, and continued to punch her even as she passed out and revived consciousness. (PSR ¶95; Doc. 348 at 29-30). While this evidence was not admitted at trial, defense counsel was aware of what A.G. told the agents, and any such knowledge could have impacted a reasonable attorney's decision as to whether the statement constituted inadmissible hearsay or an exception thereto.

excited utterances); *Packer*, 2010 WL 7367820, at *11 (finding state court's decision that deceased victim's statements to several people during the twelve hour period after rape and burglary were properly admitted under the identical section of Alabama's evidentiary rule equivalent to Federal Rule 803(2)).

Moreover, a reasonable attorney also could have interpreted A.G.'s statement to the responding officers that she was scared soon after Movant violently assaulted her as a present sense impression. Likewise, a responding officer's discussion with Investigator Nelson relaying A.G.'s condition also could qualify as a sense impression separate and apart from A.G.'s own statement. As a result, a competent attorney could have believed either statement was admissible. *See, e.g., United States v. Vasquez*, 818 F. App'x 93, 95-96 (2d Cir. 2020) (affirming district court's admission as a present sense impression mother's statement to 911 that defendant had been 'holding her hostage with a loaded gun for three days' because during the call the mother described in real time that she felt the defendant posed an imminent threat to her safety even though he was in the shower at the time of the call); *United States v. Shipp*, No. 19-CR-029 (NGG), 2020 WL 1140474, at *2 (E.D. N.Y. Mar. 9, 2020) (finding statement made to responding officer that, *inter alia*, the defendant had shot him was admissible as a present sense impression).

It also is not out of the realm of possibility that a reasonable attorney could have believed Investigator Nelson's testimony simply was presented to explain why

he was called to the hotel to investigate, which would have been admissible.  *See,*

*e.g., Handler v. Mayhew*, No. 1:11-CV-00308-JAW, 2013 WL 6858881, at *4 n.10

(D. Maine Dec. 30, 2013) (finding admissible detective's alleged double hearsay

statement that he went to residence in response to 911 call after dispatcher relayed

that the victim had called from a neighbor's house claiming her husband had thrown

her in a dumpster with no clothes, because the statement was offered to show the

detective's motive for visiting the residence and not that the husband had, in fact,

thrown the victim naked into the dumpster).  At most, reasonable, competent

attorneys could have differed as to whether any of these statements were

objectionable, and thus the Court cannot say that "no competent counsel would have

taken the action that his counsel did take."  *See Dell v. United States*, 710 F.3d 1267,

1281 (11th Cir. 2013).  Nor is there a reasonable probability that the Court would

have sustained any such objection.

And even if none of the statements were admissible Movant cannot show

prejudice from counsel's failure to object thereto, as there was other evidence

presented at trial that A.G. was afraid and had visible injuries at the Gwinnett County

hotel the day that Investigator Nelson encountered her.  Indeed, Koren testified that

she was working with A.G. at a Gwinnett County hotel when Movant told her to

bring food to A.G., and when Koren did so she observed that A.G. had visible

injuries.  (Doc. 278 at 73-74).  Koren testified that she did not report A.G.'s injuries

to Movant, "[b]ecause, I mean, I'm pretty sure he already knew." (*Id.*). Together with Investigator Nelson's testimony that his own observation of A.G. was that she was scared and shaken and had visible injuries, as well as his testimony that Movant deleted A.G.'s Backpage ad and all of their social media conversations that same night [Doc. 273 at 177-79, 181-182, 188-189; Doc. 274 at 31], a jury certainly could have inferred that Movant caused A.G.'s injuries.

For all of these reasons, Movant has failed to show that there is a reasonable probability that but for the admission of Investigator Nelson's statement the outcome would have been different; *i.e.,* that he was prejudiced by any failure on counsels' part to object thereto. Accordingly, Movant is not entitled to relief in connection with Ground Four. *See, e.g., Morgan v. United States*, 785 F. App'x 682, 686 (11th Cir. 2019) (finding defendant not prejudiced by hearsay statement being admitted because it was cumulative of other evidence and thus there was not a reasonable probability that its exclusion would have made a difference); *Packer*, 2010 WL 7367820, at *21 (finding no prejudice even if admitted statements were testimonial hearsay because there was other evidence pointing to defendant's guilt, and thus any error did not have a "substantial and injurious effect or influence in determining the jury's verdict").

B.   Movant Has Failed To Show That Appellate Counsel Was Ineffective.

In Ground Five, Movant claims that appellate counsel should have argued on appeal that the evidence as to Count Ten was insufficient, and the Court therefore erred in denying the Rule 29 motion with regard thereto.

Movant was charged in Count Ten with knowingly obstructing the enforcement of federal sex trafficking laws in violation of 18 U.S.C. §1591(d) by coaching A.W. to alter the February 14, 2014, statement she gave to the LSP after Movant was arrested in New Orleans.[16]  As to that charge, the Government presented testimony from A.W. that on May 7, 2014, Movant texted her to "take back" the February 14, 2014, statement in which she discussed with officers details about Movant's sex trafficking operation.  (Doc. 280 at 83-88).  Under 18 U.S.C. §1591(d), it is illegal for someone to "obstruct[], attempt[] to obstruct, or in any way interfere[] with or prevent[] the enforcement of" sex trafficking laws.  Unlike other federal obstruction statutes, §1591(d) does not contain the word "knowingly."

When moving for a directed verdict under Rule 29 with regard to Count Ten, counsel argued that because Movant texted A.W. one week before he was indicted on the federal charges he could not have knowingly obstructed the federal sex

---

[16]    Movant also was charged with two other counts of obstruction aided by Koren, one for trying to stop M.M. from cooperating with law enforcement (Count Eleven), and the other with regard to instructing L.W. to erase Movant's Apple iCloud and social networking accounts knowing they contained evidence of sex trafficking (Count Twelve).  (Doc. 59).  The Court granted the Rule 29 motion only as to the obstruction count involving M.M.  (Doc. 282 at 99).

trafficking laws.  (Doc. 281 at 66, 68-70, 75-76, 78, 85-86, 188).  Just as he did in his Rule 29 motion, Movant relies on *Pettibone v. United States*, 148 U.S. 197, 207 (1893) in support of this argument.

In *Pettibone*, the Supreme Court held that a federal indictment charging obstruction of federal investigations could not be used against defendants who only conspired in sole violation of state law.  *Id.* at 207, 209.  In *Pettibone*, however, the Supreme Court specifically distinguished that factual scenario with those specific situations where, like here, "the same act or series of acts may constitute an offense equally against the United States and the state, subjecting the guilty party to punishment under the laws of each government."  *Id.* at 209.  Importantly, in *Pettibone* there was no federal investigation.  *Id.*

As a result, the circumstances in this case fall squarely within those facts from which the Supreme Court distinguished in *Pettibone*.  Indeed, when A.W. provided a statement to the LSP in February of 2014, Movant's sex trafficking operation violated the laws of both Louisiana and the United States, and although Movant was arrested on state charges at that time there was an ongoing pending federal investigation.[17]  Consequently, *Pettibone* is inapposite.

---

[17]   Investigator Nelson testified that he had been investigating Movant since approximately June of 2013.  (Doc. 273 at 151).

Instead, the Government's argument that the Court should review how courts have interpreted other federal obstruction statutes is well taken. *Cf. Marinello v. United States*, __ U.S. __, 2018 S. Ct. 1101, 1109 (2018) (finding "highly instructive" its own cases interpreting other federal obstruction statutes as a guide to interpreting Internal Revenue Code's obstruction provision). To that point, 18 U.S.C. §1519 proscribes destroying or altering documents to influence a federal investigation. Unlike §1591(d), §1519 contains the word "knowingly." Even so, courts have held that §1519 does not require that the defendant know his conduct would obstruct a federal investigation or violate a federal statute. *See, e.g., United States v. Fontenot*, 611 F.3d 734, 736 (11th Cir. 2010) (upholding jury instruction related to obstruction under 18 U.S.C. §1519 that "[t]he government is not required to prove that the defendant knew his conduct would obstruct a federal investigation, or that a federal investigation would take place, or that he knew of the limits of federal jurisdiction"); *United States v. McRae*, 702 F.3d 806, 836 (5th Cir. 2012) (holding that to be convicted under §1519 the defendant does not have to know the federal nature of the crime, *i.e.,* that it "might become the subject of a federal, rather than state, investigation"); *United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011) (finding that the word "knowingly" in §1519 "modifies only the surrounding verbs: 'alters, destroys, conceals, covers up, falsifies, or makes a false entry' and does not mean that a defendant has to know the existence of federal jurisdiction to

be convicted); *cf. United States v. Feola*, 420 U.S. 671, 677 n.9 (1975) ("[T]he existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.").

The rationale in those cases interpreting §1519 are persuasive, and the Court agrees with the Government that §1591(d) does not require that the defendant specifically know of the federal nature of the investigation to be convicted of obstruction. *See Stennis*, 2022 WL 2312214, at *5 (finding evidence sufficient for conviction under §1591(d) because after his arrest by state police, "[t]here [wa]s little dispute that [the defendant] knew that he was being investigated for *something*") (emphasis in original); *United States v. Delay*, Crim. Action No. 2:15-cr-00175RSL-1, Doc. No. 586 at 2 (W.D. Wash. Feb. 6, 2018) (rejecting argument that §1591(d) required that the government prove defendant knew of the investigation's federal nature because "[h]e need not have known the nature or details of those enforcement efforts to violate the statute") (PACER), *aff'd*, 788 F. App'x 551 (9th Cir. 2019).

Regardless, a movant does not have a right to have every possible argument raised on appeal, and it is up to appellate counsel to "'winnow[] out' weaker arguments[.]" *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983); *Hittson v. GDCP Warden*, 759 F.3d 1210, 1263 (11th Cir. 2014). Importantly, appellate counsel raised eight grounds for relief on appeal, *Robinson*, 812 F. App'x 969, and Movant

has not demonstrated that counsel was deficient for failing to raise this particular issue or that he was prejudiced thereby. As a result, Movant is not entitled to relief in connection with Ground Five.

## IV.    Conclusion

Based on the foregoing reasons, **IT IS RECOMMENDED** that Travis Sentell Robinson's motion to vacate his sentence [Doc. 391] be **DENIED WITH PREJUDICE**.

## V.    Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing §2255 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."    28 U.S.C. §2253(c)(2) provides that a certificate of appealability ("COA") may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  In order for the certification requirement to fulfill its function of weeding out frivolous appeals, a court should not automatically issue a COA; rather, the applicant must prove "something more than the absence of frivolity" or "the existence of mere 'good faith' on his or her part."  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (citations omitted).

Movant need not prove, however, that some jurists would grant the §2255 motion.  *See id.*  "The question is the debatability of the underlying constitutional claim, not the resolution of that debate."  *See Lamarca v. Secretary, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009) (citing *Miller-El*, 537 U.S. at 325).  In other words, Movant need only demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Based on the foregoing discussion, reasonable jurists would not find "debatable or wrong" the undersigned's determination that Movant has not demonstrated that he received ineffective assistance of counsel.  *See Slack*, 529 U.S. at 484.

Accordingly, **IT IS FURTHER RECOMMENDED** that a COA be denied.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**IT IS SO RECOMMENDED** this 30th day of November, 2022.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

45